**Sidney TAGER, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 286, Docket 29076.**

United States Court of Appeals Second Circuit.

Argued Jan. 8, 1965.

Decided April 12, 1965.

Sidney Tager, New York City, petitioner pro se.

Donald R. Jolliffe, Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., George P. Michaely, Jr., Sp. Counsel, S. E. C., Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

Sidney Tager petitions to review an order of the Securities and Exchange Commission which revoked his registration as a broker and dealer and expelled him from membership in the National Association of Securities Dealers ("NASD"). The Commission found that Tager wilfully violated the anti-fraud and anti-manipulative provisions of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), of §§ 10(b) and 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o(c) (1), and Rules 10b–5, 10b–6 and 15c1–2 thereunder (17 C.F.R. §§ 240.10b–5, 240.10b–6, 140.15c1–2). Tager argues that his violations of the Securities Acts were not "willful" as required by statute, and that the sanctions imposed by the Commission exceed the legally permissible limit. We resolve these issues against Tager and affirm the order of the Commission.

The evidence before the hearing examiner was substantially uncontroverted. In August 1960, Tager (doing business as Tager Company) agreed to underwrite the sale of 68,000 shares of Diversified Capital Corporation. The shares were to sell at $4 each, with Tager retaining 60 cents commission and an expense allowance of 20 cents for each share sold. After a short period of generally unsuccessful efforts by Tager to sell the stock, Diversified's president suggested that bid and asked quotations by other brokers and dealers appear in the sheets published by the National Quotations Bureau.

Tager approached Darius Incorporated and Englander & Co., Inc., and persuaded them to insert quotations in the sheets at prices set by Tager. Tager also promised that he would attempt to find buyers and sellers for Darius. From September 15 through October 4, 1960, one or both firms inserted prices of 3¾ bid and 4½ asked; from October 5 to November 4, 4 to 4½; from November 5 to November 14, 3¾ to 4⅛ or 4½. Two customers were recommended to Darius by Tager during this period. When Tager was advised by his attorney that his arrangement with Darius and Englander "was not right," he conveyed this information to the firms. Englander ceased entering prices for Diversified in the sheets on October 17, 1960; Darius ceased on November 14, 1960.

Shortly after terminating its price quotations for Diversified stock, Englander purchased 100 shares of Diversified from Darius, which had acquired them as a result of its bids. About a month later, Tager's wife, on Tager's suggestion, purchased these shares from Englander. Tager testified that Englander did not know what to do with the stock "so I said that I would take it from him."

The total trading in Diversified involving Darius and Englander amounted to 406 shares. Englander bought and sold 100 shares and Darius bought and sold 306 shares, all at around $4 per share. Darius made a $15 profit; Englander made none.

In December 1960 Tager withdrew as underwriter, having ceased to sell Diversified stock in November. As underwrit-

er Tager sold 11,647 shares of Diversified to 81 investors, for a total of $46,588, out of which he retained $9,318. From September 15 through November 14, 1960, when quotations were being entered by Darius and Englander, Tager sold 7,062 shares to 48 investors, for a total of $28,248, out of which he retained $5,650.

Tager admitted that he told some investors that there was a market in the stock during the period when Darius and Englander were placing quotations and that he never disclosed that a market was being made at his request.

The Commission found that Tager had unlawfully stimulated the insertion of quotations which led to a false appearance of market activity in Diversified, which he was then underwriting, had failed to disclose this fact to his customers, and had unlawfully purchased 100 shares of Diversified during the period when he acted as underwriter. Tager does not challenge these conclusions, but argues that revocation of his broker-dealer registration was inappropriate as his actions were not willful.

One of the grounds for revocation of a broker-dealer registration, and the only one applicable here, § 15(b) (1) (2) (D) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b) (1) (2) (D), is that the broker or dealer "has willfully violated any provisions of the Securities Act of 1933, or of this chapter, or of any rule or regulation thereunder." Tager maintains that "to show willfulness, the Commission would have to show that Tager had an understanding that such activities were manipulative." We find this argument wholly lacking in merit.

■■ It has been uniformly held that "willfully" in this context means intentionally committing the act which constitutes the violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts. Gilligan, Will & Co. v. SEC, 267 F.2d 461, 468 (2 Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959); Hughes v. SEC, 85 U.S.App.D.C. 56, 174 F.2d 969, 977 (1949); 2 Loss,

Securities Regulation 1310 n. 88 and cases cited therein. We have recently held that a finding of actual knowledge is not necessary for finding criminal liability under § 24 of the Securities Act, 15 U.S.C. § 77x, for "willful" violations of §§ 5(a) and (c) and 17(a), 15 U.S.C. §§ 77e(a), (e), and 77q(a). United States v. Benjamin, 328 F.2d 854, 863 (2 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). As Professor Loss reminds us, "It is conceivable, therefore, that 'willfully' means something less in § 15(b) than it does in the penal provisions of the SEC acts." 2 Loss, op. cit. supra at 1309. It is inconceivable that it means something more. Tager's acts met the requirement of willfulness as found in 15(b).

■ Finally, Tager attacks the appropriateness of the sanctions imposed by the Commission in revoking his broker-dealer registration and expelling him from membership in the NASD. Such steps may be taken only if the revocation is "in the public interest." §§ 15(b), 15A(b) (4) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78o(b), 78o–3(b) (4).

Tager urges in mitigation that he had never been involved in a questionable transaction previously; that he cooperated with the Commission in this and in other investigations; that no showing was made of public losses as a result of his activities (cf. Otis & Co., 35 S.E.C. 650, 657–58 (1954)); and that this was his first underwriting. While these factors might have warranted a lighter sanction, they did not require one.

■ Registration of broker-dealers is a means of protecting the public (cf. Pierce v. SEC, 239 F.2d 160, 163–164 (9 Cir. 1956)), and the determination of the sanctions necessary to protect the public rests primarily within the competence of the Commission. "[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" American Power and

Light Co. v. SEC, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946). See also Moog Industries, Inc. v. FTC, 355 U.S. 411, 413, 78 S.Ct. 377, 2 L.Ed. 2d 370 (1958); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 561 S.Ct. 845, 85 L.Ed. 1271 (1941). The Commission must have a very large measure of discretion in determining what sanctions to impose at a particular time in particular cases. Failing a gross abuse of discretion, the courts should not attempt to substitute their untutored views as to what sanctions will best accord with the regulatory powers of the Commission. We find no abuse of the Commission's powers and discretion in this case.

██ Tager is not aided by the fact that the only cases which the Commission cites in support of the imposition of this extreme sanction involved situations of greater harm to the public. (See, Theodore A. Landau, 40 S.E.C. 1119 (1962); R. L. Emacio & Co., 35 S.E.C. 191 (1953); Floyd A. Allen & Co., 35 S.E.C. 176 (1953); Adams & Co., 33 S.E.C. 444 (1952).) Cf. F. C. C. v. WOKO, 329 U.S. 223, 227–228, 67 S.Ct. 213, 91 L.Ed. 204 (1946); Shawmut Ass'n v. SEC, 146 F.2d 791, 796–797 (1 Cir. 1945); 2 Davis, Administrative Law § 17.07 n. 15 and cases cited therein. The injury inflicted on the public, the market price inflation accomplished through the rigging, and the amount of profit realized by the broker are not immutable guides to an appropriate sanction as these factors are largely dependent upon market conditions and chance.

As harsh as the sanction here might seem, it does not necessarily mean that Tager will be permanently barred from participation in the securities business. Under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b), the registration of a broker or dealer is subject to the same "public interest" requirement as is his revocation discussed above. Further, § 15A(b) (4) of the same Act, 15 U.S.C. § 78o–3(b) (4), indicates that a broker whose registration has been revoked may be restored to membership in the NASD if the Commission finds it in the public interest to do so. Moreover, the Commission advises us that there are "procedures whereby persons whose registrations have been revoked or whose memberships in the NASD have been suspended might in appropriate cases continue in the securities business under proper supervision."

Affirmed.