Mortimer W. HANLY, Arthur Gladstone, Frederick C. Stutzmann, Jr., Steven Charles Paras, and Charles Arthur Fehr, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

Nos. 587, 588, 589, 590, 650,
Dockets 33178, 33233, 33234, 33269, 33276.

United States Court of Appeals
Second Circuit.

Argued May 22, 1969.

Decided July 24, 1969.

David Ferber, Solicitor, Securities and Exchange Commission, Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, Paul Gonson, Asst. Gen. Counsel, Harvey L. Pitt, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for respondent.

James C. Sargent, New York City (Robert S. Newman, Jack I. Samet, Parr, Doherty, Polk & Sargent, New York City, on the brief), for petitioner Hanly.

Francis E. Koch, New York City (Andrew N. Grass, Jr., Windels, Merritt & Ingraham, New York City, on the brief), for petitioners Gladstone and Stutzmann.

Thomas A. Harnett, New York City (Thomas H. McManus, Harnett & Reid, New York City, on the brief), for petitioner Paras.

Harold I. Geringer, New York City (Lian & Geringer, New York City, on the brief), for petitioner Fehr.

Before LUMBARD, Chief Judge, FEINBERG, Circuit Judge, and TIMBERS, District Judge.[*]

TIMBERS, District Judge:

Five securities salesmen petition to review an order of the Securities and Exchange Commission which barred them from further association with any broker or dealer.[1] The Commission found that petitioners, in the offer and sale of the stock of U. S. Sonics Corporation (Sonics) between September 1962 and August 1963, willfully violated the antifraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a), Sections 10(b) and 15(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j (b) and 78o(c)(1), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Specifically, the Commission held that "the fraud in this case consisted of the optimistic representations or the recommendations . . . without disclosure of known or reasonably ascertainable adverse information which rendered them materially misleading . . .. It is clear that a salesman must not merely avoid affirmative misstatements when he recommends the stock to a customer; he must also disclose material adverse facts of which he is or should be aware."[2] Petitioners individually argue that their violations of the federal securities laws were not willful but involved at most good faith optimistic predictions concerning a speculative security, and that the sanctions imposed by the Commission exceeded legally permissible limits. The Commission, upon an independent review of the record before the hearing examiner, affirmed his findings as to individual violations, rejected his finding of concerted action, and increased the sanctions he had imposed. We affirm in all respects the order of the Commission as to each of the five petitioners.

[*] Chief Judge of the District of Connecticut, sitting by designation.

1. Fehr was barred for only 60 days, after which he may become associated with a broker or dealer in a non-supervisory capacity if it is demonstrated that he will be adequately supervised.

## VIOLATIONS

The primary witnesses before the hearing examiner were customers of each of petitioners and the former president of Sonics. Since the Commission rejected the conclusion of the hearing examiner that petitioners had acted in concert in the conduct of their fraudulent activities,[3] we have considered separately the evidence against each petitioner and have considered the sanctions against each in the light of his specific alleged violations.

While we believe it neither necessary nor appropriate to set forth all of the evidence upon which the Commission's findings and order were based, we shall summarize sufficiently the background of Sonics and petitioners' individual violations to indicate the basis of our holding that there was substantial evidence to support the Commission's underlying finding of affirmative misrepresentations and inadequate disclosure on the part of petitioners.

### U. S. Sonics Corporation

Sonics was organized in 1958. It engaged in the production and sale of various electronic devices. From its inception the company operated at a deficit. During the period of the sales of its stock here involved, the company was insolvent.

By 1962 the company had developed a ceramic filter which was said to be far superior to conventional wire filters used in radio circuits. Sonics' inability to raise the capital necessary to produce these filters led it to negotiate with foreign and domestic companies to whom Sonics hoped to grant production licenses on a royalty basis. Licenses were granted to a Japanese and to a West German company, each of which made initial payments of $25,000, and to an Argentine company, which made an initial payment of $50,000. License negotiations with

2. Richard J. Buck & Co., Securities Exchange Act Release No. 8482, pp. 7–8 (December 31, 1968).

3. Richard J. Buck & Co., supra note 2, at 11 n. 23.

domestic companies continued into 1963 without success; negotiations terminated with General Instrument Corporation on March 20, 1963 and with Texas Instruments, Incorporated, on June 29, 1963. In addition, testing of the filter by prospective customers provided unsatisfactory results.

Merger negotiations with General Instrument and Texas Instruments likewise proved unsuccessful. Sonics' financial condition continued to deteriorate with the cancellation by the Navy of anticipated orders for hydrophones. On December 6, 1963 bankruptcy proceedings were instituted against Sonics, and on December 27, 1963 it was adjudicated a bankrupt.

During most of the relevant period petitioners were employed by Richard J. Buck & Co., a partnership registered as a broker-dealer.[4] Gladstone and Fehr were co-managers of the firm's Forest Hills, N. Y., branch office. Hanly was the manager of its Hempstead, N. Y., office. Stutzmann and Paras were salesmen in the Hempstead office.

*Gladstone*

Gladstone (along with Paras) first heard of Sonics in September 1962 during a conversation with one Roach who had been a sales manager for his prior employer, Edwards and Hanly. Roach compared Sonics to Ilikon, whose stock he had previously recommended and which had been highly successful. Sonics was praised for its good management, large research and development expenses and, most important, its development of a ceramic filter. In January 1963 Roach told Gladstone of the possibility of a domestic license and furnished him with a copy of an allegedly confidential 14 page report which predicted a bright future for the company.[5] In February Gladstone met with Eric Kolm, Sonics' president, who confirmed most of the statements in the report. During the spring of 1963 Gladstone learned of the licensing and merger negotiations mentioned above.

On the basis of this information and knowing that Sonics had never shown a year end profit since its inception, that it was still sustaining losses, and that the 14 page report was not identified as to source and did not contain financial statements, Gladstone told Hanly, Stutzmann and Paras about the company and made certain representations to his customers.

Evidence of affirmative misrepresentations by Gladstone to his customers regarding Sonics stock included the following: Sonics was a winner and would make money. It had a fabulous potential and would double or triple. It would make Xerox look like a standstill and would revolutionize the space age industry. Gladstone himself had purchased the stock for his own account and he would be able to retire and get rich on it. It had possibilities of skyrocketing and would probably double in price within six months to a year. Although it had not earned money in the past, prospects were good for earnings of $1 in a year. Sonics had signed a contract with General Instrument. The stock would go from 6 to 12 in two weeks and to 15 in the near future. The 14 page report had been written by Value Line. The company was not going bankrupt. Its products were perfected and it was already earning $1 per share. It was about to have a breakthrough on a new product that was fantastic and would revolutionize automobile and home radios.

In addition to these affirmative misrepresentations, the testimony disclosed that adverse information about Sonics' financial difficulties was not disclosed by Gladstone; that some customers had

---

4. Buck was censured by the Commission for its failure to exercise adequate supervision over its employees. It was permitted to withdraw its registration as a broker-dealer. It has not petitioned for review.

5. The source of this report was not disclosed to Gladstone. Its source is not disclosed in the record.

received confirmations for orders they had not placed; and that literature about the company was not provided. Most of the customer-witnesses testified that they had purchased in reliance upon the recommendations of Gladstone.

*Paras*

Paras learned of Sonics during the same September 1962 conversation between Roach, Gladstone and Paras referred to above.

Evidence of affirmative misrepresentations by Paras to his customers regarding Sonics stock included the following: Sonics had a good growth possibility. It should double after three or four weeks (to one customer); it could double, i. e. increase 8 to 10 points, within four to six months (to another customer); and it would rise 10 to 15 points (to still another customer). Paras had bought the stock himself. The company was about to enter into a favorable contract for its filters with Texas Instruments and Texas Instruments might acquire Sonics.

In addition to these affirmative misrepresentations, Paras never mentioned Sonics' adverse financial condition; he never provided any literature about the company; and in at least one instance he sent a confirmation to a customer who claims not to have ordered the stock.

When asked by the hearing examiner why he recommended a stock like Sonics. when the commissions he would receive would be negligible, Paras replied that on the basis of his reliable information he hoped that Sonics would make money for his customers who would refer others to him. "[I]t would be a feather in my cap to buy a stock at $8 and sell it at $29 or $30."

*Stutzmann*

Stutzmann learned of Sonics, including its weak financial condition, through information given him by Gladstone and Paras and through examination of the anonymous 14 page report referred to above.

Evidence of affirmative misrepresentations by Stutzmann to his customers regarding Sonics stock included the following: Sonics had just acquired a big contract and should reach 15 in a year. Sonics is similar to Ilikon. Although its past earnings were not impressive, they would soon get bright because of licensing royalties. The price would double in six months. Since the price had dropped, this was a good time to buy. It was a hot prospect.

As with Gladstone and Paras, customer-witnesses testified that Stutzmann did not provide any adverse financial information or any literature, and that he falsely claimed to have bought Sonics stock himself.

*Fehr*

Fehr, with Gladstone, was a co-manager of the Forest Hills, N. Y., branch office of Buck & Co. He first learned of Sonics at a meeting in February 1963 attended by Gladstone, Roach, Eric Kolm and Fehr. It was Fehr, together with Gladstone, who conveyed to Hanly, Stutzmann and Paras information concerning Sonics, including its poor financial condition and its record of losses.

Despite Fehr's admission that he had received from Sonics' president, Kolm, the exact 1962 financial information regarding the company, he failed to disclose to Buck's customers interested in Sonics (including a customer to whom he made a direct sale of the stock) that the company had sustained operating losses for four consecutive years, that it had a large accumulated deficit, that it had no working capital and that it was insolvent.

Instead, in recommending the purchase of Sonics stock to a customer in March 1963, Fehr represented that the company was engaged in negotiations which, if successful, would lead to a price rise of 3 to 4 points; that the company was about to break through on a product he thought would be substantial; and that Sonics stock was an extremely good speculation. To another

customer, who was concerned with the decline of the stock following his purchase upon representations by Gladstone, Fehr said between March and May 1963 that the stock was worth holding; that it was a good stock; that its decline was only temporary; and that he had purchased the stock for himself and a member of his family (which he had). On another occasion, Fehr told a group of people in the Buck office that there was nothing to worry about concerning Sonics.

## Hanly

Hanly, manager of the Hempstead, N. Y., office of Buck & Co., learned of Sonics and its weak financial condition from Gladstone and Fehr.

Although fully aware of Sonics' financial condition, Hanly did not disclose any financial information regarding the company to either of the two customers who purchased the stock on March 1, 1963 upon his recommendation.

Instead, Hanly told one of these customers that Sonics had a new invention that would rock the world; that it would merge with another company in the near future; and that its stock would rise from 8 to 12 or 15 in a short time. Although this customer instructed Hanly to hold any loss on her $3000 investment to $300, he failed to do so; when she demanded satisfaction, Hanly predated a sell order to minimize her loss.

## Law Applicable to Violations

In its opinion the Commission quoted from the record in attributing the representations discussed above respectively to each of the petitioners. It concluded that their optimistic representations or recommendations were materially false and misleading. Fraud was found both in affirmative falsehoods and in recommendations made without disclosure of known or reasonably ascertainable adverse information, such as Sonics' deteriorating financial condition, its inability to manufacture the filter, the lack of knowledge regarding the filter's commercial feasibility, and the negative results of pending negotiations.

The Commission found that the sophistication of the customers or prior relationships which many of them had enjoyed with the respective petitioners were irrelevant. It held that the absence of a boiler room did not justify affirmative misrepresentations or a failure to disclose adverse financial information. The relevance of a customer's nonloss of money or a salesman's speculation in the stock likewise was discounted.

The sensitivity of operations in the securities field and the availability of opportunities where those in a position of trust can manipulate others to their own advantage led Congress to pass the antifraud provisions of the statutes with which the instant proceedings are concerned. Congress committed to the Commission the responsibility of supervising the activity of broker-dealers and registered representatives.

When a securities salesman fraudulently violates the high standards with which he is charged, he subjects himself to a variety of punitive, compensatory and remedial sanctions. In the instant proceedings petitioners have not been criminally charged, nor have they been sued for damages by their customers arising from the alleged misrepresentations. Instead, in private proceedings initiated by the Commission, each petitioner's *privilege* of being employed in the securities industry has been revoked. It is in this context that the issues before the Court must be considered. More particularly, we are here concerned with the expertise of the Commission in its assessment of how the public interest best may be protected from various kinds of intentional fraud and reckless misconduct which often threaten securities transactions, especially, as here, in the over the counter market.

Brokers and salesmen are "under a duty to investigate, and their violation of that duty brings them within the term 'willful' in the Exchange

## 596

Act."[6] Thus, a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant. He must analyze sales literature and must not blindly accept recommendations made therein.[7] The fact that his customers may be sophisticated and knowledgeable does not warrant a less stringent standard.[8] Even where the purchaser follows the market activity of the stock and does not rely upon the salesman's statements, remedial sanctions may be imposed since reliance is not an element of fraudulent misrepresentation in this context.[9]

■ Just as proof of specific intent to defraud is irrelevant for insider violations of Rule 10b–5, it is irrelevant in private proceedings such as these:

"In an enforcement proceeding for equitable or prophylactic relief, the common law standard of deceptive con-

duct has been modified in the interests of broader protection for the investing public so that negligent insider conduct has become unlawful . . .. Absent any clear indication of a legislative intention to require a showing of specific fraudulent intent . . . the securities laws should be interpreted as an expansion of the common law both to effectuate the broad remedial design of Congress . . . and to insure uniformity of enforcement . . . ."[10]

■■ A securities dealer occupies a special relationship to a buyer of securities[11] in that by his position he implicitly represents he has an adequate basis for the opinions he renders.[12] While this implied warranty may not be as rigidly enforced in a civil action where an investor seeks damages for losses allegedly caused by reliance upon his unfounded representations,[13] its applica-

---

**6.** Dlugash v. SEC, 373 F.2d 107, 109 (2 Cir. 1967). See also Tager v. SEC, 344 F.2d 5, 8 (2 Cir. 1965) (" 'willfully' . . . means intentionally committing the act which constitutes the violation . . .. [A]ctual knowledge is not necessary.")

**7.** Walker v. SEC, 383 F.2d 344 (2 Cir. 1967) (per curiam).

**8.** Lehigh Valley Trust Co. v. Central National Bank, 409 F.2d 989, 992 (5 Cir. 1969).

**9.** N. Sims Organ & Co., Inc. v. SEC, 293 F.2d 78 (2 Cir. 1961), cert. denied, 368 U.S. 968 (1962). See also Commonwealth Securities Corporation, Securities Exchange Act Release No. 8360, p. 5 (July 23, 1968): "It is irrelevant that customers to whom fraudulent representations are made are aware of the speculative nature of the security they are induced to buy, or do not rely on such representations."

Reliance may be an element of fraudulent misrepresentation in other situations, see discussion in Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2 Cir.), cert. denied, 389 U.S. 970 (1967); see also Mutual Shares Corp. v. Genesco Inc., 384 F.2d 540, 544 (2 Cir. 1967), but it is not an element in a case such as this.

**10.** SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–55 (2 Cir. 1968) (en banc), cert. denied, sub nom. Kline v. SEC, 394 U.S. 976 (1969). The applicability of the above quoted language to misrepresentation such as that before the Court in the instant case would appear self-evident.

**11.** SEC v. Great American Industries, Inc., 407 F.2d 453, 460 (2 Cir. 1968) (paralleling the affirmative duty of disclosure imposed upon insiders with that imposed upon broker-dealers).

**12.** See Kahn v. SEC, 297 F.2d 112, 115 (2 Cir. 1961) (concurrence of Judge Clark) for an analysis of the "shingle theory" of implicit representation and its relationship to the antifraud provisions of the securities law. See also Aircraft Dynamics International Corp., 41 S.E.C. 566 (1963); Alexander Reid & Co., Inc., 40 S.E.C. 986, 990 (1962) ("A broker-dealer cannot avoid responsibility for unfounded statements of a deceptive nature, recklessly made, merely by characterizing them as opinions or predictions or by presenting them in the guise of a probability or possibility.")

**13.** See, e. g., Phillips v. Reynolds & Co., 294 F.Supp. 1249 (E.D.Pa.1969) (in an action for damages by investors, failure of the broker to disclose a substantial deficit is not a basis for civil liability since a broker is not a virtual insurer of

bility in the instant proceedings cannot be questioned.[14]

Sonics was an over the counter stock. Those who purchased through petitioners could not readily confirm the information given them. In Charles Hughes & Co., Inc. v. SEC, 139 F.2d 434 (2 Cir. 1943), cert. denied, 321 U.S. 786 (1944), this Court recognized the difficulties involved in over the counter stocks and the special duty imposed upon those who sell such stocks not to take advantage of customers in whom confidence has been instilled.

In summary, the standards by which the actions of each petitioner must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investiga-

tion. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.[15]

A salesman may not rely blindly upon the issuer for information concerning a company, although the degree of independent investigation which must be made by a securities dealer will vary in each case. Securities issued by smaller companies of recent origin obviously require more thorough investigation.

## SANCTIONS

The Commission is authorized by Section 15(b)(7) of the Securities Exchange Act, 15 U.S.C. § 78o(b)(7), to bar any person from association with a broker or dealer "if the Commission finds that such . . . barring . . . is in the public interest . . .," and that such person has willfully violated the Securities Act or the Securities Exchange Act.

Acting pursuant to this statutory authority and upon a finding that it was in

his recommendations even where he does not disclose all material facts; reliance is also required); Weber v. C. M. P. Corp., 242 F.Supp. 321 (S.D.N.Y.1965) (some form of scienter required, more than innocent or negligent misstatements). Cf. SEC v. Van Horn, 371 F. 2d 181, 185 (7 Cir. 1966), criticizing Weber.

14. Petitioners argue that their activities are to be distinguished from those of a "boiler room" and that, absent a finding of boiler room operations here, the Commission's strict standards should not be applied against petitioners.

A boiler room usually is a temporary operation established to sell a specific speculative security. Solicitation is by telephone to new customers, the salesman conveying favorable earnings projections, predictions of price rises and other optimistic prospects without a factual basis. The prospective buyer is not informed of known or readily ascertainable adverse information; he is not cautioned about the risks inherent in purchasing a speculative security; and he is left with a deliberately created expectation of gain

without risk. Berko v. SEC, 316 F.2d 137, 139 n. 3 (2 Cir. 1963). See also R. A. Holman & Co., Inc., v. SEC, 366 F. 2d 446 (2 Cir. 1966), modified on other grounds, 377 F.2d 665 (2 Cir.) (per curiam), cert. denied, 389 U.S. 991 (1967); Harold Grill, 41 S.E.C. 321 (1963).

Salesmen in a boiler room are held to a high duty of truthfulness which is not met by a claim of lack of knowledge. The Commission having previously refused to condone misrepresentation in the absence of a boiler room, see Charles P. Lawrence, Securities Exchange Act Release No. 8213, p. 3 (December 19, 1967), aff'd, 398 F.2d 176 (1 Cir. 1968), cited in Armstrong Jones and Co., Securities Exchange Act Release No. 8420, p. 9 (October 3, 1968), we specifically reject petitioners' argument that absence of boiler room operations here is a defense to a charge of misrepresentation.

15. See Securities Exchange Act Release No. 6721 (Feb. 2, 1962), quoted in Practicing Law Institute, Disclosure Requirements of Public Companies and Insiders, 154-55 (Flom, Garfinkel and Freund ed. 1967).

the public interest to do so, the Commission, having found that each petitioner had violated the antifraud provisions of the securities laws, ordered that each be barred from further association with any broker or dealer, except that Fehr was barred for only 60 days, after which he may return to the securities business in a non-supervisory capacity and upon an appropriate showing that he will be adequately supervised.[16]

■ The courts, including ours, uniformly have recognized the fundamental principle that imposition of sanctions necessarily must be entrusted to the expertise of a regulatory commission such as the SEC; and only upon a showing of abuse of discretion—such as the imposition of a sanction unwarranted in law or without justification in fact—will a reviewing court intervene in the matter of sanctions.[17]

■ For the most part, petitioners' attacks upon the sanctions here imposed do not merit discussion. Their arguments were fully considered by the Commission which, in accordance with its undoubted authority, gave different weight to such arguments than petitioners would like. Moreover, their legal claims on the matter of sanctions so recently have been considered by this Court that we do not believe it either necessary or appropriate further to dilate upon the subject. For example, the obvious disparity in culpability between petitioners, reflected in our summary above of the evidence of violations by each, is not a proper basis for challenging the Commission's sanctions;[18] nor is the fact that in the case of one or more petitioners only one investor-witness testified against him.[19] And of course even the permanent bar order which the Commission in its discretion has imposed as to four of the petitioners is not necessarily an irrevocable sanction; upon application,[20] the Commission, if it finds that the public interest no longer requires the applicant's exclusion from the securities business, may permit his return—usually subject to appropriate safeguards.[21]

■ There is one aspect of the sanction issue in the instant case which does merit brief mention: the Commission's imposition of *greater* sanctions upon four of the petitioners than ordered by the hearing examiner. This appears to be a matter of first impression, at

---

16. In thus imposing sanctions, the Commission agreed with the hearing examiner's determination that Gladstone should be *barred* from association with any broker or dealer, but it found inadequate the sanctions imposed upon the other petitioners. The examiner had ordered Fehr, Stutzmann and Paras *suspended* from association with any broker or dealer for five months, Hanly for four months; and the reinstatement of Stutzmann and Paras was conditioned upon a showing of adequate supervision in accordance with the Commission's usual practice.

   The three sanctions authorized by the statute are *censure, barring,* or *suspension.* 15 U.S.C. § 78o(b)(7).

17. American Power & Light Co. v. SEC, 329 U.S. 90, 112–13 (1946); Vanasco v. SEC, 395 F.2d 350, 352–53 (2 Cir. 1968); Marketlines, Inc. v. SEC, 384 F. 2d 264, 267 (2 Cir. 1967) (per curiam),

cert. denied, 390 U.S. 947 (1968); Tager v. SEC, 344 F.2d 5, 8–9 (2 Cir. 1965); Berko v. SEC, 316 F.2d 137, 141–42 (2 Cir. 1963); Lawrence v. SEC, 398 F.2d 276, 280 (1 Cir. 1968); Associated Sec. Corp. v. SEC, 293 F.2d 738, 741 (10 Cir. 1961); Pierce v. SEC, 239 F.2d 160, 163 (9 Cir. 1956).

18. Vanasco v. SEC, *supra* note 17, at 353; Winkler v. SEC, 377 F.2d 517 (2 Cir. 1967) (per curiam); Dlugash v. SEC, 373 F.2d 107, 110 (2 Cir. 1967).

19. Vanasco v. SEC, *supra* note 17, at 353, citing Walker v. SEC, 383 F.2d 344 (2 Cir. 1967), and Ross Securities, Inc., 41 S.E.C. 509 (1963).

20. The procedure for relief from statutory disqualification is set forth in 17 C.F.R. § 240.15Ab–1.

21. See, e. g., Vanasco v. SEC, *supra* note 17, at 353; Tager v. SEC, *supra* note 17, at 9; Ross Securities, Inc., *supra* note 19, at 517 n. 10.

least in this Court.[22]   The Commission clearly has the authority to modify, including the authority to increase, sanctions ordered by a hearing examiner in his initial decision,[23] and we so hold. Moreover, our independent examination of the record in the instant case satisfies us that there is substantial evidence to support the Commission's finding that the sanctions ordered by the examiner with respect to all petitioners except Gladstone were inadequate to protect the public interest and that there is substantial evidence to support the Commission's imposition of increased sanctions in the public interest with respect to each of the four.  We suggest, however, that in the future it would be appropriate for the Commission to make specific findings in support of its conclusion that sanctions ordered by a hearing examiner are inadequate and should be increased.  Such practice will facilitate the Court's task of determining whether the findings with respect to increased sanctions are supported by substantial evidence.

Affirmed.

The Commission informs us that, since January 1, 1965 (the amendments to the Securities Exchange Act which became effective August 20, 1964, 78 Stat. 565, having first granted to the Commission direct power to bar an individual from being associated with a broker-dealer), of 21 applications for reinstatement by persons who in effect have been barred from the securities business, 16 have been granted (omitting certain refinements in these statistics).

We express the hope that, in the event any of the petitioners before us should apply to reenter the securities business, the Commission will provide for early and speedy consideration of such applications, in contrast to the delay in the instant proceedings.

22.  Counsel for the Commission informs us that increased sanctions similarly have been imposed in at least three other cases. Century Securities Company, Securities Exchange Act Release No. 8123 (July 14, 1967), aff'd sub nom.  Nees v. SEC and Reigel v. SEC, 414 F.2d 211 (9 Cir. 1969) ;  Richard Bruce & Co., Securities Exchange Act Release No. 8303 (April 30, 1968), appeal pending sub nom. Fink, et al. v. SEC, Dkt. Nos. 33275, 33159 and 33287 (2 Cir.) ;  Langley-Howard, Inc., Securities Exchange Act Release No. 8361 (July 25, 1968), appeal pending sub nom.  O'Leary v. SEC, Dkt. No. 22494 (D.C.Cir.).

23.  See Section 8(a) of the Administrative Procedure Act, 5 U.S.C. § 557(b), "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule," and 17 C.F. R. § 201.17(g) (2), "On review the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial decision by the hearing officer and make any findings or conclusions which in its judgment are proper on the record."