Stanton L. WHITNEY, Petitioner,

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 78–1326.

United States Court of Appeals, District of Columbia Circuit.

Argued 3 April 1979.

Decided 28 June 1979.

Petition for Review of an Order of the Securities and Exchange Commission.

Steven B. Duke, for petitioner.

Michael J. Connell, Sp. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, and Jacob H. Stillman, Principal Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., were on the brief, for respondent.

Also Michael K. Wolensky and Elisse B. Walter, Counsel, Securities and Exchange Commission, Washington, D. C., entered appearances, for respondent.

Before TAMM and WILKEY, Circuit Judges, and CORCORAN, Senior District Judge.[*]

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Petitioner seeks review of an order of the Securities Exchange Commission suspending him for nine months from association with any broker or dealer in securities.[1] The Commission based its order on findings that petitioner had willfully violated provisions of the Securities Exchange Act of 1934 [2] by engaging in fraudulent conduct in connection with the sale of securities belonging to the Town of Stratford, Connecticut. Because we believe these findings were not supported by substantial evidence, we set aside the subject order and remand the case for proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Facts.*

Petitioner Whitney is the sole proprietor of a business in Fairfield, Connecticut, selling insurance and various types of securities, the latter as a registered representative of CNA Investor Services, Inc. (CNA), a broker-dealer registered with the SEC. In connection with his insurance business, Whitney had on occasion arranged to have retirement pension funds placed under the management of Connecticut General Life Insurance Company (CG), a service for which CG compensated him. In 1972 and 1973 Whitney sought to secure for CG the management of such a fund belonging to the Town of Stratford. Although CG had originally proposed to assume management of the entire fund, the Stratford Pension Board chose to place with it only one-half, leaving the remainder with the prior mana-

ger. Under this arrangement, one-half of the fund assets, chiefly securities listed on the New York Stock Exchange, would be sold at the outset and the cash proceeds invested by CG. In accordance with an accompanying escrow agreement, CG would conduct the initial liquidation once the securities were delivered by the Town.

In the course of its deliberations the Pension Board raised the question whether Whitney's compensation, if any, would be a charge against the fund assets. On two occasions, John Elliot, CG's area pension fund manager and a friend of Whitney's, represented to the pension board that Whitney's fee, billable to the fund, would be $700. However, believing the $700 "finder's fee" would be inadequate, Elliot and Whitney began considering other avenues of compensation, among them an arrangement whereby Whitney, as a registered securities representative for CNA, would share in the brokerage commissions generated by CG's liquidation of the fund assets. The idea required another broker-dealer inasmuch as CNA was not a member of the New York Stock Exchange and could not directly liquidate the fund. For this purpose, Elliot approved the brokerage firm of Thomson & McKinnon, Auchincloss & Kohlmeyer (TM) in August 1973. Thereafter Whitney wrote to TM explaining what was intended.

In October or November 1973 Elliot told Whitney that senior officers at CG had "for political reasons" disapproved Whitney's receiving commissions on the liquidating sales but that Whitney would yet be compensated through commissions on other brokerage. Although in December 1973 Elliot was instructed to tell Whitney that CG would not participate in any arrangement whatever for indirect compensation, it is uncertain

[*] Sitting by designation pursuant to 28 U.S.C. § 294(c).

1. *In the matter of Stanton L. Whitney*, Admin. Proc. File 3–5031, Rel. No. 14468 (14 February 1978). The Commission's order is reprinted in the Joint Appendix (J.A.) at 24.

2. Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) (1976). *See also* SEC rule 10b–5, 17 C.F.R. § 240.10b–5 (1978).

what he conveyed to Whitney.[3] Then, in January 1974, Elliot died.

Whitney was introduced to Elliot's successor, Lawrence English, on 3 April, at which time, according to the Commission, Whitney was told that "CG would not permit him to receive compensation from the portfolio liquidation or from any other CG brokerage, and that CG would not utilize TM for the liquidation."[4] After Whitney objected, raising his contrary understanding with Elliot, English again pursued the matter at CG and later telephoned Whitney, confirming what had been said on 3 April.[5]

Thereafter Whitney proposed to English that Whitney earn additional compensation by personally conducting the liquidating of the fund.[6] English indicated that CG would be agreeable, but that Whitney would have to prevail on the Town to retain him. At Whitney's request, Frederick Castellani, an underwriter in CG's pension department, wrote Whitney on 10 April confirming CG's approval but noting that the escrow agreement, providing that CG liquidate the fund, would in that event have to be rescinded. Later in April 1974 English spoke with Whitney on the telephone and apparently was told that Whitney and the Town were "moving along nicely" in the direction of a satisfactory liquidation agreement.

On 16 May the Town's Director of Finance called Whitney and asked him to pick up the fund securities for CG, whereupon Whitney called Alvin Rapps at TM and told him to expect delivery of the securities. Whitney received the securities on 17 May, signing receipts which recited that the securities were received "for conveyance to" CG. Then, accompanied by the Town's pension board chairman, Whitney took the securities to TM's New York office. While other TM personnel reviewed the securities, Rapps prepared a new account form in the name of the "Town of Stratford Pension Fund Agency," with a notation that the account was "for the courtesy" of CNA. After reading the account form Whitney told Rapps that it was unnecessary to send copies of confirmations of the securities sales to CG in addition to the Town and CNA, as was provided in the account form.[7]

According to the Commission, after delivering the securities to TM Whitney continued his efforts to persuade the Town to liquidate the fund through him. On 29 May, apparently at Whitney's request, an officer of CG wrote to the pension board chairman recommending that the Town liquidate the fund in the manner proposed by Whitney. On 31 May Whitney wrote to the pension board chairman, enclosing a draft letter which he proposed the board send to TM authorizing the liquidation "to conform with" CG's letter of 29 May. The Town, however, declined to proceed with the liquidation through TM unless CG would approve the proposed sequence of liquidation, which it refused to do. After apparently fruitless discussions, the Town attorney on 17 July instructed CG to proceed with the liquidation in accordance with the escrow agreement.

It was learned, however, that in the event TM did not conduct the liquidation it would still charge the Town $5,000 for services it

---

3. The Commission found that Elliot "may have led Whitney to believe" that some arrangement for indirect compensation, as, for example, commissions on unrelated securities transactions, would be possible. Memorandum Decision at 2, J.A. at 25.

4. *Id.*

5. According to Whitney, nothing was said in either the 3 April meeting or the subsequent telephone call with English about not employing TM to liquidate the securities. Brief of Petitioner at 14–15. The Commission disbelieved Whitney and we accept its view of the episode. *See* 604 F.2d at 682.

6. It is uncertain who first suggested that Whitney earn additional compensation by conducting the liquidation for the Town. The ALJ thought it was Whitney. Initial Decision at 8, J.A. at 10. The Commission was uncertain. Memorandum Decision at 2, J.A. at 25. Whitney maintains it was English. Brief of Petitioner at 16, J.A. at 333. English could not remember. J.A., at 187.

7. Memorandum Decision at 3, J.A. at 26. Whitney denies discussing the account form with Rapps. Reply Brief of Petitioner at 5.

had already performed. Consequently, the pension board decided on 6 August to rescind the escrow agreement and to liquidate through TM after all. The securities were then sold in the normal course and Whitney received $3,500 in commissions in accordance with CNA's agreement with TM.

### B. *Course of the Proceedings.*

Following a five-day evidentiary hearing, the presiding Administrative Law Judge found that Whitney, seeking additional compensation, had engaged in a fraudulent scheme in connection with the sale of securities belonging to the pension fund in violation of section 10(b) of the 1934 Act and the Commission's Rule 10b–5. The ALJ suspended Whitney for nine months from association with any securities broker or dealer. The Commission, after reviewing the record, agreed that Whitney had "willfully violated" section 10(b) and rule 10b–5, and affirmed the ALJ's imposition of a nine-month suspension.

**8.** § 15(b)(6), 15 U.S.C. § 78*o*(b)(6) (1976), authorizes the Commission to suspend any person who has engaged in conduct specified in, *inter alia,* § 15(b)(4)(D). 15(b)(6) provides as follows:

The Commission, by order, shall censure or place limitations on the activities or functions of any person associated, or seeking to become associated, with a broker or dealer, *or suspend for a period not exceeding twelve* months or bar any such person from being associated with a broker or dealer, if the Commission finds, on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension, or bar is in the public interest and that such person has committed or omitted any act or omission enumerated in subparagraph (A), (D), or (E) of paragraph (4) of this subsection, has been convicted of any offense specified in subparagraph (B) of said paragraph (4) within ten years of the commencement of the proceedings under this paragraph, or is enjoined from any action, conduct, or practice specified in subparagraph (C) of said paragraph (4). It shall be unlawful for any person as to whom such an order suspending or barring him from being associated with a broker or dealer is in effect willfully to become, or to be, associated with a broker or dealer *without the consent of the Commission,* and it shall be unlawful for any broker or dealer to permit such a person to become,

## II. ANALYSIS

Under section 15(b) of the Securities Exchange Act[8] the Commission may suspend for a period not exceeding twelve months any person from being associated with a broker or dealer if the Commission finds, after notice and hearing, that the person has willfully violated any provision of the Act and that the suspension would be in the public interest. The antifraud provisions of the Act, set out in section 10(b),[9] make it unlawful for any person directly or indirectly to "use or employ, in connection with the purchase or sale of any security . . any manipulative or deceptive device or contrivance" in violation of the Commission's rules. Rule 10b–5 in turn proscribes three categories of conduct. It makes it unlawful:

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

or remain, a person associated with him without the consent of the Commission, if such broker or dealer knew, or in the exercise of reasonable care should have known, of such order.

15 U.S.C. § 78*o*(b)(6) (1976).

§ 15(b)(4) provides, in part, as follows:

The Commission, by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds, on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension, or revocation is in the public interest and that such broker or dealer, whether prior or subsequent to becoming such, or any person associated with such broker or dealer, whether prior or subsequent to becoming so associated—

\* \* \* \* \* \*

(D) has willfully violated any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, this title, the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or is unable to comply with any such provision.

15 U.S.C. § 78*o*(b)(4) (1976).

**9.** 15 U.S.C. § 78j(b) (1976).

cumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The Commission, after a hearing,[10] found that Whitney "deliberately deceived" CG and the Town pension board in violation of section 10(b) and rule 10b–5.[11] The Commission thought it plain enough that the fraud was in connection with the sale of securities inasmuch as Whitney's sole purpose was "to obtain compensation by arranging to have those securities sold through an agent of his own choosing."[12] While we suppose that Whitney's conduct occurred in connection with the sale of securities for purposes of section 10(b), we neither find the proven conduct fraudulent, nor think that those allegations which arguably do describe fraud were substantiated in the record.

10. 17 C.F.R. § 240.10b–5 (1978).

11. The Commission apparently found violations of all three subsections· of rule 10b–5. See Memorandum Decision at 6, J.A. at 29.

12. Memorandum Decision at 6, J.A. at 29.

13. Memorandum Decision at 6 n.5, J.A. at 29.

14. 183 U.S.App.D.C. 301, 307, 562 F.2d 820, 826 (1977). See also Addington v. Texas, —— U.S. ——, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The Chief Justice, speaking for a unanimous Supreme Court in Addington, approvingly noted the usage of the "clear and convincing" standard in fraud cases:

The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." Woodby v. INS, 385 U.S. 276, 285 [, 87 S.Ct. 483, 17 L.Ed.2d 362] (1967). See also McCormick, Evidence § 320 (1954); 9 Wigmore, Evidence § 2498 (3d ed. 1940). One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduced the risk to the defendant of having his

## A. Standard of Proof.

The Commission recited in a footnote that it found the evidence of Whitney's fraud "clear and convincing" whether or not such were in fact the relevant standard of proof.[13] It recalled that this court fairly recently held in Collins Securities Corp. v. SEC[14] that factual findings in at least some administrative proceedings brought, like this one, under the broker-dealer provisions in section 15(b) must be sustained by clear and convincing evidence. Evidently, however, the Commission is of the view that Collins is either wrong or inapposite.[15] We disagree. Collins, which we reaffirm today, plainly governs this case.[16]

In Collins we said that the Commission may not revoke a broker-dealer's registration upon a finding of fraud without clear and convincing evidence. A mere preponderance, we concluded, was not enough in view of the seriousness of the potential sanction and the frequently ambiguous inferential evidence encountered in fraud cases.

reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. See, e. g., Woodby v. INS, supra, at 285 [, 87 S.Ct. 483] (deportation); Chaunt v. United States, 364 U.S. 350, 353 [, 81 S.Ct. 147, 5 L.Ed.2d 120] (1960) (denaturalization); Schneiderman v. United States, 320 U.S. 118, 125, 159 [, 63 S.Ct. 1333, 87 L.Ed.2d 1796] (1943) (denaturalization). —— U.S. at ——, 99 S.Ct. at 1808. As we observed in Collins, 183 U.S.App.D.C. at 305, 562 F.2d at 824, a requirement that the evidence be not only "clear and convincing," but also "unequivocal," would in the majority of fraud cases make proof all but impossible. We remain satisfied that "clear and convincing" evidence is the appropriate standard in such cases as this.

15. See Brief of SEC at 18–20 & n.10.

16. Collins was decided by a unanimous panel. The Commission's request for rehearing en banc was denied, no judge of this court requesting en banc consideration. Collins v. SEC, 183 U.S.App.D.C. 301, 562 F.2d 820 (1977) (per curiam).

The Commission would have us distinguish the instant case from *Collins* on grounds that (1) Whitney's nine-month suspension is a less serious deprivation than the revocation in *Collins* and (2) the "direct evidence in this case has a naturally greater pursuasion [*sic*]."[17] These supposed distinctions do not matter. Even were we for some reason inclined to choose the standard of proof under section 15(b) on a case-by-case basis, a practice which would not have occurred to us, we would not depart from the "clear and convincing" standard in this case. Like the revocation in *Collins*, a suspension for nine months imposes a serious loss, both as a short-run matter of forgone business and, perhaps more grievously, as a permanent injury to reputation. Any supposed difference in this respect is one of degree which we think immaterial to the adequate measure of proof. Moreover, despite the presence of some "direct" testimony in this case, the state of the evidence is hardly unequivocal and we are reluctant to forgo the added assurance of correctness afforded by a heightened standard of proof.[18] In any event, the Commission has taken an overly parsimonious view of our rationale in *Collins*; we hold here that any sanction imposed under section 15(b) which depends on a finding of fraud[19] must be sustained by clear and convincing evidence. Such proceedings inevitably are subject, in varying degrees, to the uncertainties of circumstantial and subjective proof, and result in stigmatizing the defendant irrespective of the formal sentence meted out.

## B. *The Scope of Judicial Review.*

As is frequently observed, the burden of proof and the scope of review in administrative law cases, as in ordinary judicial proceedings, are separate matters.[20] The former is the measure of belief which legally must exist in the mind of the trier of fact in order to sustain a finding. The scope of review, of course, marks the bounds of a reviewing court's authority to set aside factual findings, and review is customarily limited to ascertaining whether there is enough evidence of the legally correct sort to save the findings from irrationality.

The scope of our review in this case is governed by section 25 of the Securities Exchange Act which provides that "[t]he findings of the Commission as to the facts, if supported by substantial evidence, are conclusive."[21] Thus, as the Commission correctly notes, petitioner may not try his case *de novo* before this court and we may not substitute our view of the facts for the Commission's. We review the Commission's findings only to ascertain whether, in the cant of appellate court opinions, there is evidence which a reasonable person might find clear and convincing.[22] If so, and if the Commission's action is otherwise in accord with the law, we must affirm. After carefully reviewing the record in this case, we have concluded that it will not support a

---

17. *Id.* at 21.

18. Indeed it would be extraordinary to conclude that the proper standard of proof depends upon the strength of the evidence in each particular case.

19. We intend the word "fraud" not merely in its common-law sense, but comprehending all violations of § 10(b) and rule 10b–5. *See also Collins Securities Corp. v. SEC*, 183 U.S.App. D.C. 301, 305, 562 F.2d 820, 824 (1977) (the "clear and convincing evidence" standard has been imposed in hundreds of civil fraud cases).

20. *See Woodby v. Immigration Service*, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Collins Securities Corp. v. SEC*, 183 U.S.App.D.C. 301, 304 n.12, 562 F.2d 820, 823 n.12 (1977); Jaffe, *Administrative Law: Burden of Proof and Scope of Review*, 79 Harv.L. Rev. 914 (1966).

21. 15 U.S.C. § 78y(a)(4) (West Supp.1978).

22. As a practical matter, we doubt it would ever be appropriate to set aside findings of fact supported by substantial evidence, whatever the standard of proof. *See Woodby v. Immigration Service*, 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966) ("[i]n other words, an appellate court in a criminal case ordinarily does not ask itself whether it believes that the evidence at the trial establishes guilt beyond a reasonable doubt, but whether the judgment is supported by substantial evidence"). *See also* Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure*, 69 Yale L.J. 1149, 1152–63 (1960).

finding that petitioner willfully violated the Securities Exchange Act.[23]

## C. *The Commission's Account.*

As reconstructed by the Commission, Whitney intentionally deceived CG and the Town in the course of his efforts to liquidate the fund via TM. The Commission's view of what occurred is, briefly, as follows: As of 3 April Whitney knew that while CG had no intention to compensate him further, it was agreeable to having the Town conduct the liquidation which, if accomplished through TM, would permit Whitney a commission. However, before Whitney could persuade the Town to liquidate in that fashion, he was called upon to deliver the securities to CG for liquidation in accordance with the escrow agreement. Without authority, Whitney delivered the securities instead to TM in order to "delay their liquidation" while he attempted to win over the Board.[24] Then Whitney "misled CG into believing that it would be relieved of its responsibility for the liquidation,"[25] pre-sumably so it would be unconcerned with performance of the escrow agreement. And finally, in order to obtain the Town's authorization to liquidate, Whitney led the pension board to believe, falsely, that CG had chosen TM to conduct the liquidation.[26].

Thus, while Whitney's alleged fraud was found to "comprehend his entire course of conduct," there were, in the Commission's view, three somewhat distinct deceptions. First, Whitney accepted the securities from the Town on 16 May without disclosing his intention to divert them to TM for liquidation. Second, both before and after diverting the securities, Whitney led CG to believe the Town would liquidate the fund directly. And third, Whitney misled the Town itself about what was going on.

There is, concerning the diversion of the securities to TM, appreciable evidence that Whitney knew on 16 May that in the event CG conducted the liquidation, TM would not participate. Although testimony on the point was contradictory, the Commission

---

23. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a private cause of action for damages will not lie under § 10(b) and rule 10b–5 in the absence of an allegation of "scienter," *i.e.*, intent to deceive, manipulate, or defraud on the defendant's part. *Id.* at 193, 96 S.Ct. 1375. The Court expressly pretermitted the question whether scienter was an essential element of injunctive actions under the Act; the Commission is of the view that it is not, at least in actions brought, like this one, under § 15(b). We have no occasion to decide the relevance of *Hochfelder* to this case. Section 15(b) by its terms requires that a person have "willfully" violated the securities laws, 15 U.S.C. § 78o (b)(6) (1976), and we think "willfullness" in this sense is more or less congruent with *Hochfelder*'s use of "scienter." *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965) ("[i]t has been uniformly held that 'willfully' in this context means intentionally committing the act which constitutes the violation"). The Commission in the instant case found that petitioner acted "willfully" and with "an intent to deceive." Memorandum Decision at 6 & n.5, J.A. at 29. These are the findings we set aside.

24. Memorandum Decision at 5, J.A. at 28.

25. *Id.*

26. Whitney, on the other hand, doggedly maintains that he was in fact authorized to deliver the securities to TM, or at least he thought he was; that he did so "without any . . . expectation of receiving commissions;" and that he did not "knowingly foster any misimpressions." Brief of Petitioner at 7–8. According to Whitney, the idea that he and TM would conduct the liquidation originated with CG, which felt uneasy with the escrow agreement. When nothing was done to arrange for "outside" liquidation, Whitney, assuming that CG had abandoned the idea, "could hardly help but believe that CG's eight month old decision to use TM for the liquidation remained in place," *id.* at 17; hence the delivery to TM on 17 May. Only after CG's letter of 29 May again recommended that the Town itself handle the liquidation did Whitney pursue matters with TM. And finally, when CG declined to approve TM's formula of liquidation Whitney advised the parties to proceed under the escrow agreement, which they would have done were it not for TM's $5,000 fee.

Happily for petitioner, the disposition of this case depends on neither our believing his account, which we find somewhat disingenuous, nor on our general view of his conduct. We confine our attention to determining whether the Commission has adequately shown a violation of the securities laws.

was plainly entitled to resolve the matter of credibility as it did. Moreover, we are least inclined to second guess such findings where, as here, the Commission affirmed the ALJ who, of course, heard the testimony in question.[27] Still, the fact at most suggests that Whitney's conduct on the 16th may have been *ultra vires*. Without some accompanying deception, whatever violation of state law, if any, may have resulted, there was no violation of rule 10b–5.[28] And the record is quite clear that CG was not deceived, at least concerning the initial delivery of the securities to TM. By all accounts, CG knew three days later that TM had the securities and apparently was so informed in a telephone call from Whitney.[29]

The Commission reasons that CG did not object to the delivery of securities to TM because it believed that the Town would conduct the liquidation, presumably through TM. The only evidence that Whitney mislead CG in this regard is English's somewhat vague recollection that in April, prior to delivery, Whitney had said something to the effect that he and the Town were "moving in that direction" or "moving along nicely,"[30] from which English inferred that Whitney had been retained by the Town. English also testified to conversations, occurring in May or June, in which

Whitney indicated that liquidation through TM was being delayed by "paper work."[31] Setting aside whether anything said by Whitney could, in other circumstances, have been misleading, it is clear from the record that CG was not misled. English later testified that CG's 29 May letter to the Town, in which CG recommended outside liquidation, was sent at Whitney's request because it was needed "to solidify the arrangement he was working on with the Town."[32] Moreover, by all accounts, for the Town to proceed without CG it would have been necessary to rescind the escrow agreement. This, of course, as was recalled in CG's 29 May letter, had not been done. In light of these undisputed facts, it would appear wholly unsupportable to conclude that CG in fact believed that the Town had agreed to conduct the liquidation.

Since the Commission erroneously concluded that CG was misled, it is somewhat uncertain whether it viewed Whitney's conduct as misleading simply on its face, and thus violative of rule 10b–5.[33] Assuming that it did, we regard the evidence as insufficient to sustain the finding. However sanguine Whitney may have appeared to CG, by the Commission's own account he conveyed to them that the arrangement was unsettled as late as 29 May. Degrees

---

27. *See Vanasco v. SEC*, 395 F.2d 349, 351 (2d Cir. 1968); *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 589 (2d Cir. 1961).

28. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 471–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

29. Memorandum Decision at 3, J.A. at 26; J.A. at 780; Reply Brief of Petitioner at 7.

30. J.A. at 189. *See also id.* at 208.

31. *Id.* at 226.

32. *Id.* at 190–91.

33. Although in a private damage action a plaintiff must prove that he relied to his detriment on the defendant's deception, there is no requirement of reliance or damages in an administrative proceeding like this one. *See Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963); *Hughes v. SEC*, 85 U.S.App.D.C. 56, 174 F.2d 969 (1949). In *Hughes* we said:

It is our understanding that the Commission is by statute empowered, and, in fact, is required to revoke a broker-dealer registration where there has been willful violation of the statute any where such revocation is in the public interest . . . . Assuming the existence of both of the above-stated prerequisites for revocation, the revocation is 'proper even if one, or none, of the particular clients here involved has been misled or has suffered injury.

85 U.S.App.D.C. at 61, 174 F.2d at 974. Nevertheless, we admit that the absence of those traditional elements of fraud raises, inferentially, some doubt concerning the existence of fraudulent intent and, particularly on these ambiguous facts, a question of prosecutorial improvidence. In a private damage action neither the Town nor CG could have made out an action for damages; the claim of any harm would have been gossamer.

of candor beyond this, at least in these circumstances, are beyond the purview of rule 10b–5.

Finally, according to the Commission, Whitney led the Town to believe, falsely, that CG had chosen TM to conduct the liquidation. As the Commission recited its view of the facts:

> At the same time, Mr. Whitney created the impression with the Town that the liquidation was proceeding under CG's direction. Thus, he asked TM to prepare a plan of liquidation of the Town's securities portfolio [J.A. 354–55]; following preparation of the plan he drafted a proposed letter of instructions from the Town to TM authorizing the liquidation [J.A. 85–87, 355]; and then he urged Mr. Caraglior to sign and deliver these instructions to TM approving TM's liquidation plan [J.A. 85–87, 120–21]. When Mr. Caraglior raised questions as to whether he should sign the letter, Mr. Whitney falsely stated that the plan had been approved by CG [J.A. 121, 125–26].[34]

In our view the record does not nearly support the inference that Whitney deliberately misled the Town. According to the Commission, after Whitney delivered the securities to TM he "continued his efforts to induce the Town to use his services" for the liquidation.[35] That is why, according to the ALJ, Whitney requested the letter of 29 May in which CG recommended to the Town that it handle the liquidation directly. Whitney thus procured a letter which on its face disclosed to the Town (1) that CG was not in possession or control of the securities and (2) that CG preferred that the securities be liquidated without its involvement.

When the Town asked Whitney about CG's letter of 29 May, Whitney did seek advice from TM concerning the advisable sequence of liquidation, as was only natural if he expected to arrange the liquidation. Thereafter, in a letter to the pension board referring to CG's letter of 29 May, Whitney

proposed draft instructions to be sent to TM authorizing liquidation, again as would occur in the course of the "outside" liquidation. At this point, according to the Commission, Whitney falsely stated that the sequence had been approved by CG. Whitney did in fact say something of the sort,[36] but apparently he was more or less correct. It is evident from the record that CG had no objection to the proposed sequence.[37] The difficulty arose because CG would not commit to writing anything likely to make it accountable for the choice. The accountability which existed under the escrow agreement was apparently what most mattered to the Town, and we suspect that had CG formally approved the proposed sequence the Town would have been otherwise indifferent to "outside" liquidation.

It is fairly obvious that the Town was unaware that the terms of its bargain with CG were shifting in the manner they were. We have no occasion, however, to speculate whether more diligence or prudence in various quarters would have eliminated the misunderstanding. We merely hold that the Town's ignorance may not be laid to any deliberate deceit by Whitney. The evidence on this point is so contradictory and ambiguous that we think no reasonable person would find it clear and convincing.

## III. CONCLUSION

The Commission cast petitioner as an ingenious schemer, deliberately spreading misimpressions and confusion throughout this affair, and so, in violation of the securities laws. The record simply does not yield substantial evidence to support a finding, based upon clear and convincing evidence, that petitioner willfully violated the antifraud provisions. Accordingly, the Commission's order, depending as it does on such a finding, is

*Vacated and remanded for further proceedings.*

---

34. Brief of SEC at 11; Memorandum Decision at 3, J.A. at 26.

35. *Id.*

36. *See* J.A. at 121, 125–26.

37. At least that is what English said. *See id.* at 160.