**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Michael RANDY, a debtor in bankruptcy, P. Michael Goodman, Peter W. Woodbridge, a debtor in bankruptcy, Michael J. Clark, James C. Morris, David C. Wiley, George J. Conway, David A. Johnston, H. Ralph Sylvester, Donald R. Krueger and John C. Hawver, Defendants.**

No. 94 C 5902.

United States District Court,
N.D. Illinois,
Eastern Division.

March 2, 1999.

Gregory P. Von Schaumburg, Lori A. Trowbridge, Jill A. Snyder, Chief Branch of Enforcement, Chicago, IL, for S.E.C.

Patrick Davis, Clearwater, FL, for Johnston.

### MEMORANDUM OPINION AND JUDGEMENT ORDER AGAINST DAVID A. JOHNSTON

ANDERSEN, District Judge.

The Securities and Exchange Commission ("SEC") filed this action against eleven individuals alleging that they violated the registration and anti-fraud provisions of the federal securities laws by engaging in a scheme to defraud over 500 public investors out of approximately $16 million by offering and selling bogus certificates of deposit issued by an entity called Canadian Trade Bank. The SEC alleges that defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c), by offering and selling certificates of deposit that were not registered with the SEC. The SEC also alleges that the defendants violated Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1), by engaging in securities transactions for others while not registered as broker-dealers. The SEC also claims that defendants committed fraud in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5.

Since the SEC filed its complaint on September 27, 1994, defendants Morris, Woodbridge, Clark, and Wiley have settled with the SEC. Defendants Randy, Slyvester, Conway, Krueger, Hawver, and Goodman have defaulted and this court has entered final judgment against them. David A. Johnston is the only remaining defendant. The SEC has filed a motion for summary judgment against Johnston on all counts of the complaint. For all of the foregoing reasons, this court grants the motion for summary judgment.

### BACKGROUND

The following facts, taken from the parties' 12M and 12N statements and accompanying exhibits, are undisputed unless otherwise noted. In 1988, Michael J. Randy ("Randy") contracted with WFI of Beverly Hills, California to create Canadian Trade Bank in the Caribbean Colony of Monteserrat, a tiny island in the British West Indies. WFI was a corporation that was in the business of organizing, establishing, and selling previously unnamed banks on the islands of Montserrat and Grenada. Later in 1990, in an effort to eliminate "paper banks" that had no employees and no assets beyond the name and the banking license, the government of Montserrat sent notices of revocation to a number of banks including Canadian Trade Bank. The government informed Canadian Trade Bank that its license would be revoked because it failed to maintain a $300,000 minimum capital requirement. When Canadian Trade Bank failed to respond, the Montserrat government revoked the license.

Thereafter, in March 1990, Randy organized Canadian Trade Bank under the laws of Granada and attempted to establish it as a licensed bank. Because Granada had no law authorizing the licensing of offshore banks, Randy simply called Canadian Trade Bank a bank and conducted illegal and unauthorized bank business. Canadian Trade Bank had no assets, employees, or established business. In 1991, Granada began to tighten up its banking laws and required all companies acting like banks to become licensed. Canadian Trade Bank did not apply for a license and so in December 1991 it was eliminated from the rolls of registered corporations. From at least September 1990 through December 1992, Randy did business as Canadian Trade Bank, operating from his residence in Richton Park, Illinois. Randy controlled all operations and assets of Canadian Trade Bank from his home offices in Illinois. During this period, Randy also did business as International Brokers and as the God Is Real Universal Life Church, operating those companies from his home.

Randy advertised in "Broker World," a nationally circulated insurance trade publication. In "Broker World" Randy offered

insurance professionals an opportunity to earn "big commissions" through the sale of high yield "domestic (FDIC-insured) CDs and international bank CDs." Through the advertisement, Randy developed a nation-wide network of brokers who sold Canadian Trade Bank certificates of deposit. Randy also created false and misleading promotional literature that he distributed to investors and his salespersons. This literature falsely guaranteed that Canadian Trade Bank certificates of deposit would pay up to 12 to 14% interest annually that was compounded monthly, that Canadian Trade Bank maintained $100 in reserve for every $100 on deposit, that the bank was audited five times per year (one being a surprise government audit), and that Canadian Trade Bank's investment portfolio consisted of "only major national government bonds" and bonds of "major AA rated or better corporations."

The literature also falsely claimed that the certificates of deposit were safe investments that were fully insured to a minimum of 100% of each account by "International Insurance." Randy also claimed that the funds were insured by Lloyds of London (which demanded that he stop saying this), "Polaris" (which did not exist), and by international insurance companies that insured $150 for every $100 on deposit. Randy failed to disclose to investors that the Grenadian and Canadian governments had not legally licensed Canadian Trade Bank as a bank and that the U.S. government had not licensed it to conduct banking business. Randy also failed to disclose that the bank was not located in Montserrat, Grenada, or Canada, but that Randy conducted substantially all activities relating to Canadian Trade Bank at his offices in Illinois. Randy further failed to disclose that he used investor funds for, among other things, personal expenses, unrelated business expenses, paying off earlier investors, and speculative investments and loans.

Johnston first learned of Canadian Trade Bank in 1991 when he was contacted by Jim Conway. At that time, Johnston was a licensed Florida life and health insurance agent who sold various insurance products through Edison Worldwide Capital, a company he formed in 1990. Conway provided Johnston with Canadian Trade Bank promotional literature that described the purported advantages of the certificates of deposit and provided favorable comparisons of the international banking system to the U.S banking system. Conway explained that Canadian Trade Bank was a company doing business in Montserrat and Grenada. Subsequently, Johnston met with Conway and they both spoke with Randy over the telephone. Randy stated that he was dealing with offshore banks but did not provide their names. Randy told Johnston that Conway had been selling the certificates of deposit and that Conway would give him the necessary information. Randy also gave Johnston the telephone number of a contact person in Montserrat he could call to verify the information Randy had given him.

Shortly after the telephone call with Randy, Johnston and Conway contacted Montserrat to verify that Canadian Trade Bank was licensed to conduct business as a bank. Johnston and Conway spoke with a barrister who informed them that Canadian Trade Bank's charter was revoked in Montserrat and that it was moving to another island. Despite this information, Johnston agreed to sell Canadian Trade Bank certificates of deposit. In late 1991, Johnston was joined at Edison Worldwide by Ralph Slyvester, a licensed insurance agent in Florida. Johnston introduced Slyvester to Conway so that Slyvester could sell Canadian Trade Bank certificates of deposit. Johnston and Slyvester agreed to sell the certificates in exchange for a 10% commission. Johnston and Sylvester agreed to divide equally any commissions received from the sale of insurance products through Edison Worldwide. Conway, claiming to be the Canadian Trade Bank representative in Florida, de-

manded a percentage of the commissions Johnston and Sylvester received for referring them to the bank.

Johnston and Slyvester then began, along with other sales agents at Edison Worldwide, to offer and sell Canadian Trade Bank certificates of deposit. Johnston conducted seminars to discuss the certificates. From 1991 to 1993, Johnston conducted two luncheon investment seminars as the President of Edison Worldwide in which he presented information about the certificates of deposit. These seminars were intended for, and attended by, elderly retirees who were looking for safe, conservative investments. At some of these seminars, Johnston and other Edison Worldwide agents spoke about various safe investment vehicles, including annuities. Johnston presented Canadian Trade Bank certificates of deposit as a safe investment that paid a high rate of return. Johnston and other Edison Worldwide agents requested potential investors to sign a card to schedule an appointment to discuss further the certificates of deposit. In some instances, Edison Worldwide agents gave investors documents on Canadian Trade Bank and international banking.

Typically, after the seminars, Johnston and other Edison Worldwide agents met with potential investors at their homes. During these meetings, Johnston and the agents would stress the certificates' exceptionally high rate of return and its safety and would give the investors literature on Canadian Trade Bank. Johnston and the other agents helped the investor complete an application or "CD Purchase Order" form that included the terms of their investment. Johnston and his agents then instructed the investors to make checks payable to Canadian Trade Bank and informed them when they would receive their certificates. Johnston and the agents then gave the investors additional promotional material that was provided to them by Randy. Johnston and his agents also explained to the investors that the certificates of deposit were backed by "Triple A" bonds and that the certificates were able to pay 14% annual interest because the bank earned 23% on the investments it made with the funds. After an investor's check cleared, Randy sent to Johnston the investor's certificate and a 10% commission check.

From at least February to December 1992, Johnston and his Edison Worldwide agents sold at least $1.7 million in certificates to at least 77 investors. Johnston and his Edison Worldwide agents profited from the fraudulent activity be receiving commissions totaling $109,713. Of that amount, Johnston received a total of $24,-453.81 in commissions. During this period, Johnston was never registered as an associated person of a broker-dealer and Edison Worldwide was not registered with the Commission as a broker-dealer. Following his participation in Randy's scheme, Johnston was named as a respondent in an action brought by the State of Florida in 1993 regarding Canadian Trade Bank. As a sanction in that proceeding, Johnston claims to have repaid approximately $9,000 in commissions. Similarly, in January 1996, the State of Florida filed an administrative action against Johnston and a company he formed alleging that they were not registered with the state, that they sold unregistered securities, and that they engaged in fraudulent conduct.

On September 27, 1994, the SEC filed this action against Johnston, Randy, Slyvester, and Conway for their participation in the scheme with seven other individuals. These individuals are James C. Morris, Donald R. Krueger, John C. Hawver, P. Michael Goodman, Peter Woodbridge, Michael Clark, and David Wiley. The SEC alleges that the defendants made numerous material misrepresentations and omissions in the offer and sale of at least $15 million in unregistered Canadian Trade Bank certificates of deposit to over 500 investors. The SEC alleges that these misrepresentations and omission have resulted in, and will continue to result in, violations of the registration and anti-fraud

provisions of Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, as amended 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3), and Sections 10(b) and 15(a)(1) of the Exchange Act of 1934, as amended 15 U.S.C. §§ 78j(b), 78o(a)(1), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The SEC seeks injunctive relief, an accounting, disgorgement, prejudgment interest, and civil penalties.

### *LEGAL STANDARD*

Summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In making this determination, the court must draw every reasonable inference from the record in the light most favorable to the non-moving party and should not make credibility determinations or weigh evidence. *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 270 (7th Cir.1994). The nonmovant must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Celotex,*

477 U.S. at 324, 106 S.Ct. 2548. The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### *DISCUSSION*

In this case, the SEC contends that the undisputed facts establish by a preponderance of the evidence that Johnston violated the anti-fraud and registration provisions of the federal securities laws. The SEC argues that Johnston violated Sections 5(a) and 5(c) of the Securities Act by offering and selling unregistered securities in the form of Canadian Trade Bank certificates of deposit. The SEC also claims that Johnston violated Section 15(a) of the Exchange Act by engaging in securities transactions for others while not registered with the SEC as a broker-dealer under Section 15(b). Finally, the SEC maintains that Johnston participated in a scheme to defraud public investors of approximately $16 million in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 thereunder. Because each of these claims are based on the sale or offer to sell securities, we must determine whether the Canadian Trade Bank certificates of deposit constitute "securities" before turning to the substantive violations.

**I. The Canadian Trade Bank Certificates of Deposit are Securities under Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.**

The definition of a "security" is essentially the same under both Section 2(1), 15 U.S.C. § 77b(1), of the Securities Act and Section 3(a)(10), 15 U.S.C. § 78c(a)(10), of the Exchange Act. *Marine Bank v. Weaver*, 455 U.S. 551, 556 n. 3, 102

S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982). Under these sections a security includes a "note" and any "evidence of indebtedness." As the SEC correctly notes, a certificate of deposit is a specialized type of promissory note because it represents a promise to repay a principal amount, plus accrued interest at a specified rate, within a specified period of time on demand. Although a certificate of deposit is in essence a "note" that at first glance appears to fall within the purview of the federal securities laws, certificates of deposit are exempt from the definition of a "security" under certain circumstances. The Securities Act expressly exempts from its registration requirements conventional certificates of deposit and other instruments issued or guaranteed by a regulated domestic financial institution. 15 U.S.C. § 77c(a)(2) and (a)(5).

Although the Exchange Act does not expressly exclude such certificates of deposit from its scope, the Supreme Court has held that certificates of deposit issued by a bank that is regulated and insured by the federal government are not securities under the Act. *Marine Bank*, 455 U.S. at 558, 102 S.Ct. 1220. The Court reasoned that certificates of deposit issued by a federally-regulated bank are distinguishable from other long-term debt obligations because they are subject to the comprehensive set of regulations governing the banking industry. *Id.* "[W]hereas the holder of an ordinary longterm debt obligation assumes the risk of the borrower's insolvency," the banking regulations virtually guarantee a return of the investment. *Id.* at 558, 102 S.Ct. 1220. Because these purchasers are "abundantly protected under the federal banking laws," the federal securities laws provide no added protection. *Id.* at 559, 102 S.Ct. 1220. The Court noted, however, that certificates of deposit do not invariably fall outside the definition of a security, but that each transaction must be analyzed and evaluated on the basis of the instrument, the purposes intended to be served, and the factual setting as a whole. *Id.* at 561 n. 11, 102 S.Ct. 1220.

In determining if a given investment falls outside the federal securities laws, the courts have focused on the protections that exist for the investor independent of the federal securities laws. For instance, in *Wolf v. Banco Nacional de Mexico, S.A.*, 739 F.2d 1458, 1461 (9th Cir.1984), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985), the court found that certificates issued by a foreign bank were not securities because Mexico's banking regulations "provide its certificate holders with protection equivalent to that afforded depositors" in federally-regulated banks. *Id.* at 1463–64. Conversely, in *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 628–29 (8th Cir.1992), the court held that, when a broker engages in excessive buying and selling of certificates of deposits in order to maximize his commissions, the certificates should be treated as securities because the banking laws do not protect the investor's losses. *See also Safeway Credit Union v. C.H. Wagner & Co.*, 501 F.2d 1120 (9th Cir.1974) (treating certificates of deposit as securities because brokerage shifted too much risk to investors).

■ Therefore, to be something other than a "note" or "evidence of indebtedness" under Sections 2(1) and 3(a)(10), at the very least the certificate of deposit must be issued by a bank or financial institution regulated under federal or state law, or a foreign financial institution that is subject to a substantially equivalent scheme of regulation. In this case, the Canadian Trade Bank certificates of deposit were not issued by any federal, state, or foreign bank or financial institution and thus were not regulated by any federal, state, or foreign banking laws. Absent regulation under the federal securities laws, the investors in the Canadian Trade Bank certificates of deposit would be left unprotected by the fraud and misrepresentations that the Ponzi Scheme perpetrated in the marketplace. Extending the federal securities laws to this case will provide

such protection. Accordingly, we conclude that the Canadian Trade Bank certificates of deposit are "securities" under both Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

## II. Johnston Sold Unregistered Securities in Violation of Sections 5(a) and 5(c) of the Securities Act.

Turning to the substantive violations, the SEC first argues that Johnston violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities that are not registered with the SEC. Sections 5(a) and 5(c) prohibit "any person" from directly or indirectly using the mails or the means of interstate commerce to offer or sell a security unless it is registered with the SEC. 15 U.S.C. § 77e(a) and (c). A prima facie violation of Section 5 arises if it is established that the defendant directly or indirectly sold or offered to sell securities, there was no registration statement in effect as to the securities, and the sale was made through interstate facilities or the mails. *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155–56 (5th Cir.1972); *Johnston v. Bumba,* 764 F.Supp. 1263, 1271 (N.D.Ill.1991), *aff'd,* 983 F.2d 1072, 1992 WL 372264 (7th Cir.1992). The Securities Act, however, contains a number of exemptions from registration as outlined in 15 U.S.C. § 77d. The burden is on the defendant to establish that the case falls within a given exemption. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953).

In this case, the SEC has filed an attestation from its records officer that no registration statement was filed or is in effect with respect to any securities under the name Canadian Trade Bank. This attestation establishes that no registration has been filed with the SEC in connection with the offer and sale of Canadian Trade Bank certificates of deposit. The record also establishes that Johnston used the means of interstate commerce to offer and sell the certificates of deposit to investors, including mailing investor funds to Randy

in Illinois and using the telephone. Johnston does not even argue, much less produce any evidence, that he neither offered nor sold unregistered securities using the mails or the means of interstate commerce. He also fails to argue or present any evidence that the certificates of deposit were exempt from the SEC registration requirements. Under these circumstances, Johnston has failed to create a genuine issue of material fact as to whether he violated the registration requirements of Sections 5(a) and 5(c).

Accordingly, we find that the undisputed evidence of record establishes that Johnston offered and sold unregistered securities in violation of Sections 5(a) and 5(c). We therefore grant summary judgment on Count I of the complaint.

## III. Johnston Failed to Register With the SEC as a Broker–Dealer Before Engaging in Securities Transactions in Violation of Section 15(a)(1) of the Exchange Act.

Section 15(a) of the Exchange Act prohibits any broker from using interstate commerce to effect a transaction in securities or to induce or attempt to induce others to purchase or sell securities unless the broker is registered with the SEC. 15 U.S.C. 78*o*(a)(1). Section 3(a)(4) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of another." 15 U.S.C. § 78c(a)(4). Scienter is not an element of a violation of Section 15(a). *SEC v. National Executive Planners, Ltd.,* 503 F.Supp. 1066, 1073 (M.D.N.C.1980); *SEC v. Interlink Data Network of Los Angeles, Inc.,* No. 93–3073 R, 1993 WL 603274, at *8 (C.D.Cal. Nov. 15, 1993). The SEC need only establish that Johnston acted as a broker-dealer in offering and selling Canadian Trade Bank certificates of deposit and that he failed to register with the SEC under Section 15(b), 15 U.S.C. § 78*o*(b).

■ The undisputed facts of this case establish that Johnston actively sought to effect securities transactions on behalf of others by offering and selling Canadian Trade Bank certificates of deposit. Johnston offered and sold the certificates by contacting prospective investors, conducting seminars, and distributing promotional material regarding Canadian Trade Bank. Johnston and others acting on behalf of Randy were the sole contacts for those wishing to invest in Canadian Trade Bank. When an investor agreed to purchase the certificates of deposit, Johnston and others provided the investor with a purchase order form and in at least one instance assisted an investor in filling out the form. Johnston and his Edison Worldwide agents sold at least $1.7 million certificates of deposit to at least 77 investors and received a total of $109,713 for their efforts. Johnston received a total of $24,453.81 in commissions from Randy and Canadian Trade Bank. Johnston admits in his answer that he has never been registered with the SEC as a broker-dealer.

For these reasons, we find that Johnston engaged in securities transactions for the accounts of others while not registered with the SEC as a broker-dealer in violation of Section 15(a)(1). We accordingly grant the SEC's motion for summary judgment on Count V.

## IV. Johnston Participated in a Scheme to Defraud Investors in Violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 thereunder.

■ Section 17(a) of the Securities Act makes it unlawful for any person in the sale or offering of securities through the use of communication in interstate commerce:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Similarly, Section 10(b) of the Exchange Act makes it unlawful for any person, through the use of interstate commerce or the mails:

(b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . .

15 U.S.C. § 78j(b). Pursuant to Section 10(b), the SEC has promulgated Rule 10b–5 that proscribes the making of any untrue statements of material fact in connection with the sale of securities. 17 C.F.R. § 240.10b–5. To establish a violation of Section 17(a)(1) or Section 10(b) and Rule 10b–5 thereunder, the SEC must show that: (1) the defendant made an untrue statement of material fact or omitted a fact that rendered a statement made by the defendant misleading; (2) such misrepresentation or omission was made in connection with the purchase or sale of securities; and (3) was done with the intent to mislead (scienter). *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Scienter is not required for violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act. *Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958, 64 L.Ed.2d 611 (1980). We address each of these elements in turn.

### A. Johnston Made Material Misrepresentations and Omissions Concerning Canadian Trade Bank and its Certificates of Deposit.

■ A fact is material if the there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and would

view it as having significantly altered the total mix of information. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Johnston made several misrepresentations and omission to investors regarding Canadian Trade Bank and its certificates of deposit. Johnston conducted seminars that were intended for, and attended by, elderly retirees who were looking for safe, conservative investments. During these seminars, Johnston presented the Canadian Trade Bank certificates as a safe investment that paid a high rate of return. He misrepresented that the certificates of deposit were backed by "Triple A" bonds, that the certificates were guaranteed to pay 14% annual interest, and that Canadian Trade Bank invested in offshore investments. Johnston also misrepresented that Canadian Trade Bank was able to pay an annual interest rate of 14% because it earned 23% on the investments it made with investor funds.

Johnston also distributed promotional literature that he received from Randy and Conway. This literature falsely represented the existence and location of Canadian Trade Bank, the status of its banking license, the insurance and reserves backing the certificates of deposit, the safety and returns on the investment, and the use of proceeds. In addition to these affirmative misrepresentations, Johnston failed to disclose to investors that Canadian Trade Bank was not legally licensed as a bank by the Grenadian, Canadian, or U.S. governments. He did not disclose that the bank was not located in Montserrat but that Randy conducted substantially all of the bank's activities from his office in Illinois. He also failed to tell investors that he was informed by an investigator for the Florida Office of the Comptroller, Department of Banking and Finance, that the department believed that the offer and sale of the certificates was improper and that it was investigating the salespersons. Further, Johnston failed to disclose to investors that Randy used the investor funds for unrelated expenses and speculative investments.

We find that these misrepresentations and omissions were material because reasonable investors would consider them important in making an investment decision. This information went to the nature, existence, safety, and profitability of investing in Canadian Trade Bank certificates of deposit. This information was especially critical because the fraudulent scheme was primarily directed at elderly retirees who were looking for a safe investment. The misrepresentations and omissions undoubtedly led these investors to believe that the certificates of deposit were safe. *See Marks v. CDW Computer Ctrs.,* 122 F.3d 363, 369 (7th Cir.1997) (noting that the determination of materiality "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him.") (internal quotations omitted). Therefore, we conclude that the undisputed evidence establishes that Johnston made material misrepresentations and omissions regarding Canadian Trade Bank and its certificates of deposit.

### B. Johnston's Misrepresentations and Omissions Were in Connection with the Offer and Sale of Securities.

The Supreme Court has held that the "in connection with" element is a flexible standard and that any activity "touching [the] sale of securities" will suffice. *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). It is undisputed that Johnston and his Edison Worldwide agents sold at least $1.7 million Canadian Trade Bank certificates of deposit to at least 77 investors. Because these certificates of deposit are "securities" under both the Securities Act and the Exchange Act, the sale of these certificates satisfies the "in connection with" element of the federal securities laws.

### C. Johnston Acted with Scienter in Making Material Misrepresentations and Omissions Concerning Canadian Trade Bank and its Certificates of Deposit.

 To establish a claim under Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, a plaintiff must plead and prove that the defendant acted with scienter. *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). "Scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst*, 425 U.S. at 200, 96 S.Ct. 1375. The scienter element is also satisfied if the defendant acts recklessly. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 282 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Reckless conduct includes "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Meadows v. SEC*, 119 F.3d 1219, 1226 (5th Cir.1997) (internal quotations omitted).

 The standard of care is more exacting if the defendant is a broker-dealer. A broker-dealer owes a special duty of fair dealing to his clients that requires him to fully investigate the securities he recommends so that he "has an adequate basis for the opinions he renders." *Hanly v. SEC*, 415 F.2d 589, 596 (2d Cir.1969). "By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation." *Id.* at 597. Although the investigation that the broker-dealer must undertake varies with the type of security involved, securities issued by small, newly-formed companies typically require a more thorough investigation. *Id.* While this standard is ordinarily applied in cases involving registered representatives, we find that this standard should apply here because Johnston acted as a broker-dealer by recommending and selling certificates of deposit to investors. He should not be held to a lesser standard of care because he failed to comply with the registration provisions of the federal securities laws.

 The record here provides ample evidence that Johnston acted recklessly with respect to the misrepresentations and omissions about Canadian Trade Bank and its certificates of deposit. Johnston failed to conduct an adequate investigation of Canadian Trade Bank or Randy before soliciting sales for the certificates. Johnston did not contact any authorities in Granada or Montserrat to determine whether Canadian Trade Bank was a legitimate banking institution. Johnston also failed to contact any state or federal regulatory agency to determine whether Canadian Trade Bank was permitted to sell certificates of deposit in the United States or to determine whether Randy's business activities were legitimate. He further failed to request any financial statements concerning Canadian Trade Bank. If Johnston would have conducted a minimal investigation he would have discovered that Canadian Trade Bank was not licensed as a bank, that it had no assets, that it was not located in Grenada, and that Randy was using investor funds for unrelated personal expenses and speculative investments.

Moreover, the promotional materials for Canadian Trade Bank were so questionable on their face as to put Johnston on notice that further investigation was necessary to avoid misleading potential investors. These materials contained statements guaranteeing that the certificates of deposit would pay up to 12 to 14% interest annually. As the SEC correctly notes, these rates were substantially higher than the prevailing market rates for certificates of deposit issued by financial institutions that had their deposits insured by the Federal Deposit Insurance Corporation

and that were advertised in newspapers of general circulation. Johnston also should have raised a skeptical brow as to the representation that Canadian Trade Bank's portfolio consisted of "only major national government bonds" and bonds of "major AA rated or better corporations" while the certificates of deposit were offering returns at rates significantly higher than any of these underlying securities. Further, Johnston did not obtain any independent verification from the banks at which Randy claimed Canadian Trade Bank had accounts to determine if Canadian Trade Bank was in good standing.

The promotional materials also stated that Canadian Trade Bank was audited five times per year, including one "surprise government audit." Because the potential investors in Canadian Trade Bank were looking for safe investments, Johnston should have investigated whether such audits took place and what government or agency conducted the surprise audit. The material also claimed that the certificates of deposit were safe investments and that each investor's account was fully insured to a minimum of 100% by "International Insurance." Johnston is well-versed in the insurance industry and should have determined whether any such valid policy existed. He should have questioned the ability of Canadian Trade Bank or an insurance company to provide $150 in insurance for every $100 on deposit. Johnston was also paid commission from multiple bank accounts, including the personal bank accounts of Randy. He should have questioned why Canadian Trade Bank did not issue the commission checks from its bank in Granada.

Nonetheless, Johnston claims that he conducted an adequate investigation of Canadian Trade Bank and Randy by: (1) talking with Fred Miller of Barnett Bank who apparently informed Johnston that off-shore banks could pay more interest than United States banks because off-shore banks were not subject to the same rules and regulations; (2) talking with Conway who assured him that Canadian Trade Bank and the certificates of deposit were legitimate; (3) learning that other people were selling Canadian Trade Bank certificates of deposit; (4) calling directory assistance to verify the existence of a bank in Illinois that Randy claimed had Canadian Trade Bank accounts; (5) calling two banks in Chicago to confirm that Canadian Trade Bank had accounts at the banks and that it had never overdrawn these accounts; and (6) speaking with several investors who indicated that they were satisfied with their return from the certificates. Johnston argues that these facts, taken as a whole, establish that he adequately investigated Randy and Canadian Trade Bank.

We find that Johnston's investigation was perfunctory at best and ill-designed to ensure that he was providing accurate information to potential investors. As to his conversation with Fred Miller, Johnston did not provide Miller with the certificates of deposit or any information about Randy so that Miller could make an informed opinion. And in any event, there is no evidence that Miller is an expert in securities or off-shore banking such that Johnston could reasonably rely on his opinions. Receiving assurances from Conway that Canadian Trade Bank was legitimate is equally insufficient because Conway was an integral part of the scheme whose representations Johnston should have verified independently. With respect to the banks in which Canadian Trade Bank apparently had accounts, Johnston never obtained from Randy the name of any off-shore bank with which Randy was dealing. Although Johnston called two banks in Chicago to confirm that Canadian Trade Bank had accounts at the banks, he failed to obtain specifics about the accounts including balances or money flows.

The refusal of Johnston to conduct a thorough investigation of Randy and Canadian Trade Bank is especially troubling because he had direct knowledge that there were problems with the bank. In

1991, a barrister in Montserrat informed Johnston that Canadian Trade Bank was not legally chartered as a bank in Montserrat as represented by Randy. Rather than test the truth of this and other assertions Randy made about Canadian Trade Bank, Johnston agreed to sell the certificates with only a minimal investigation. Five months later, after reviewing published reports that questioned the legitimacy of Canadian Trade Bank and its business activities, Johnston contacted John Brown, an investigator for the State of Florida Office of the Comptroller, Department of Banking and Finance. During their initial conversation, Brown told Johnston that as a result of a Department of Banking investigation Florida was shutting down Canadian Trade Bank's operations in Fort Myers, Florida. Brown and Johnston then scheduled a meeting for July 16, 1992 to further discuss Canadian Trade Bank and its operations.

At that meeting, Johnston described his role in selling Canadian Trade Bank certificates of deposit and provided to Brown documents and promotional literature that Randy had provided to him. Brown informed Johnston that the Department of Banking believed that the offer and sale of the certificates was improper and that they were investigating its salespersons. Brown also confirmed that Canadian Trade Bank's charter in Montserrat was revoked in 1990 and that it was not an active bank on the islands. Brown concluded that Johnston should not sell certificates of deposit for Canadian Trade Bank. The most damning evidence of all is that Johnston, after talking with Brown, continued to offer and sell the certificates until December 1992 when Randy was arrested. Therefore, in addition to his minimal investigation, Johnston acted knowingly by disregarding these warnings and continuing to sell Canadian Trade Bank securities.

In conclusion, we find that the undisputed facts establish that Johnston acted with scienter in selling the Canadian Trade Bank certificates of deposit. Because we

have previously held that Johnston made material misrepresentations and omissions in connection with the sale of these securities, we conclude that Johnston violated Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. We also conclude that Johnston violated Sections 17(a)(2) and (a)(3) of the Securities Act because he made material misrepresentations and omissions in connection with the sale of securities. Accordingly, we grant summary judgment on Counts II, III, and IV. We now turn to what penalties are appropriate for Johnston's violations of the registration and anti-fraud provisions.

## V. Penalties

### A. Permanent Injunction

After the SEC has established that a defendant has violated the federal securities laws and regulations, it must make a "proper showing" for injunctive relief under Section 20(b), 15 U.S.C. 77t(b), of the Securities Act and Section 21(d), 15 U.S.C. § 78u(d)(1), of the Exchange Act. *Aaron,* 446 U.S. at 689, 100 S.Ct. 1945. The Seventh Circuit has explained that actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisdiction. "[O]nce a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations." *SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982). The court must consider the following factors in determining the likelihood of future violations: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Id.*

These factors weigh in favor of injunctive relief in this case. The evidence establishes that Johnston and his colleagues at Edison Worldwide sold at least $1.7 million in Canadian Trade Bank certificates to at least 77 investors. These sales generated $109,713 in commissions for Edison Worldwide, with Johnston receiving a total of $24,453.81. Johnson was integral in establishing Canadian Trade Bank as a viable alternative for those seeking a safe investment by conducting investment seminars. During these seminars, he presented false and misleading information and omitted to state material facts about Canadian Trade Bank and its certificates of deposit. These seminars were intended for, and attended by, elderly retirees who were looking for safe and conservative investments. Johnston also failed to conduct a proper investigation of Randy and Canadian Trade Bank and continued to offer and sell the certificates after Florida banking authorities warned him that doing so may be improper. Therefore, Johnston acted with a high degree of culpability and caused significant harm to a number of investors

The third factor we must consider is the isolated or recurrent nature of the infraction and the likelihood that Johnston's customary business activities might again involve him in such transactions. The contributions Johnston made to the scheme were recurrent in nature as he sold the certificates of deposit for eleven months. There is also a strong possibility that, given his occupation and career interest, Johnston may be in a position to commit future violations of the federal securities laws. Johnston was a licensed insurance agent during the period in which he sold Canadian Trade Bank certificates of deposit. Since that time, he has formed and owns a 25% interest in a company that raises money through the offer and sale of capital notes to sophisticated investors. From April 1993 to January 1997, the company has raised approximately $25 million from the sale of capital notes. In January 1993, the State of Florida filed an administrative action against Johnston and his company alleging fraud and registrations violations in connection with that securities offering. The action is still pending.

While Johnston apparently continues to engage in fraudulent conduct, he has failed to acknowledge his own culpability in the Canadian Trade Bank scheme. He continues to maintain that he unknowingly became involved in a fraudulent scheme and that Randy and Conway misled him to believe that Canadian Trade Bank was legitimate. Essentially, he depicts himself as an unwitting participant in a scheme that was concocted by Randy. His position is incredible and ignores the abundance of evidence that he knew or, at the very least, should have known of the nature of the scheme. He has also failed to assure explicitly or through his conduct that he will refrain from similar violations in the future. In fact, his recent involvement in another dubious investment scheme seems to answer the question. Thus, because we find that the fourth and fifth factors also weigh in favor of injunctive relief, we conclude that an injunction should issue in this case.

This court has delineated the terms of this injunction in a separate order entered contemporaneously with this opinion. The SEC is ordered to serve Johnston with a copy of this opinion and the injunction order by personal service and file a proof of service with the office of the Clerk for the Northern District of Illinois.

**B. Disgorgement**

The disgorgement of illicit profits is a proper equitable remedy for securities fraud. The disgorgement remedy is necessary to prevent a defendant from profiting from his illicit conduct and to protect investors by maintaining the integrity of the securities markets. *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). The

Seventh Circuit has explained that disgorgement is a remedial measure to deter future violations of the securities laws and to deprive wrongdoers of their ill-gotten gains and is not a punitive measure. *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir.1988). In determining the amount of disgorgement, all doubts should be resolved against the defrauding party. *Id.* The SEC is only required to show that the amount of disgorgement is a "reasonable approximation" of the profits that the defendant reaped from his wrongful conduct. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). The burden then shifts to the defendant to show that this approximation is inaccurate. *Id.* at 1232.

■ The SEC seeks a disgorgement order in the amount of $25,453.81 that represents the amount Johnston received in commissions through the sale of Canadian Trade Bank certificates of deposit. Johnston fails to present any evidence that this amount is an unreasonable approximation of his illicit profits. Because Johnston violated the registration and anti-fraud provisions of the federal securities laws, he would be unjustly enriched were he allowed to retain his ill-gotten gains. Accordingly, we find that Johnston is liable for $25,453.81 in disgorgement. To ensure that this amount accurately reflects his liability, Johnston is ordered to provide to the SEC on or before April 6, 1999 an accounting reflecting the amount of investor funds received and the use of those funds, including the identity and location of any assets acquired with the funds. In this accounting, Johnston should also provide evidence as to those amounts, if any, that he claims he has already disgorged. Johnston can mail this accounting to the attention of Lori Trowbridge at the SEC, 500 West Madison Street Suite 1400, Chicago, Illinois. 60661. In the event that this accounting indicates that Johnston benefitted from his fraudulent conduct by an amount greater than $25,453.81, the SEC can move this court to increase the amount of disgorgement accordingly. Conversely, in the event Johnston provides evidence that he has already disgorged some of this money, either party can move this court to reduce the amount of disgorgement.

■ The SEC also seeks prejudgement interest on the money subject to disgorgement in the amount of $12,591. In an enforcement action brought by the SEC, the disgorgement order should include all gains flowing from the illegal conduct, including prejudgment interest, to ensure that the wrongdoer does not make any illicit profits. *SEC v. Jakubowski*, 94 C 4539, 1997 WL 598108, at *2 (N.D.Ill. Sept. 19, 1997). Therefore, we hold that Johnston is liable for $12,591 in prejudgment interest. This amount is calculated from the time that Johnston received the money through the quarter ending September 30, 1997 at the interest rate, adjusted quarterly, used by the Internal Revenue Service for computation of interest on unpaid taxes.

### C. Civil Penalty

■ The SEC requests civil penalties against Johnston pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). These provisions provide that the amount of any such penalty "shall be determined by the court in light of the facts and circumstances" of the particular case. 15 U.S.C. § 78u(d)(3)(B)(i), 15 U.S.C. 77t(d)(2)(A). This court finds that Johnston should be penalized in the amount of $50,000 because his conduct "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and it "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other person." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). We find that this amount both sufficiently punishes Johnston for his intentional and reckless conduct and serves as an adequate deterrent

to others from violating the federal securities laws.

## CONCLUSION

For all of the foregoing reasons, this court grants summary judgment in favor of the SEC on all counts of the complaint. Accordingly, this court enters a permanent injunction against Johnston. This court ·has delineated the terms of this injunction in a separate order entered contemporaneously with this opinion. The SEC is ordered to serve Johnston with a copy of this opinion and of the injunction order by personal service and file a proof of service with the office of the Clerk for the Northern District of Illinois.

This court also finds that Johnston is liable for $25,453.81 in disgorgement and $12,591 in prejudgement interest. To ensure that this amount accurately reflects his liability, Johnston is ordered to provide to the SEC on or before April 6, 1999 an accounting reflecting the amount of investor funds received and the use of those funds, including the identity and location of any assets acquired with the funds. In this accounting, Johnston should also provide evidence as to those amounts, if any, that he claims he has already disgorged. Johnston can mail this accounting to the attention of Lori Trowbridge at the SEC, 500 West Madison Street Suite 1400, Chicago, Illinois. 60661. In the event that this accounting indicates that Johnston benefitted from his fraudulent conduct by an amount greater than $25,453.81, the SEC can move this court to increase the amount of disgorgement accordingly. Conversely, in the event Johnston provides evidence that he has already disgorged some of this money, either party can move this court to reduce the amount of disgorgement.

It is so ordered.